**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHICKEN SHACK POTSDAM, LLC,

                             Plaintiff,                 8:23-cv-00789 (BKS/PJE)

v.

KFC US, LLC,

                             Defendants.

**Appearances:**
*Plaintiff:*
Bruce E. Rohde
Campbell Killin Brittan & Ray, LLC
270 St. Paul Street, Suite 200
Denver, CO 80206

Gabriella Levine
William S. Nolan
Whiteman, Osterman & Hanna LLP
One Commerce Plaza
99 Washington Avenue
Suite 1900
Albany, NY 12260

*Defendants:*
Daniel J. Weiss
Jenner & Block LLP
353 N. Clark St.
Chicago, IL 60654

Michael J. Sciotti
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street - 12th Floor
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.     INTRODUCTION

Plaintiff Chicken Shack Potsdam, LLC brings this diversity action against Defendant KFC US, LLC. (Dkt. No. 14). The Amended Complaint alleges seven causes of action: (1) breach of contract, with respect to the parties' Franchise Agreement; (2) breach of contract, with respect to a separate "Guideline Agreement"; (3) breach of the implied covenants of good faith and fair dealing/bad faith with respect to both the Franchise Agreement and the Guideline Agreement; (4) estoppel, in the alternative; (5) unjust enrichment, in the alternative; 6) fraud; and (7) fraudulent nondisclosure. (*Id.*). Presently before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 17). The motion is fully briefed. (*See* Dkt. Nos. 17-1, 21, 22). For the reasons that follow, Defendant's motion is granted in its entirety.

### II.     FACTS[1]

Defendant KFC is a "world-wide franchisor" that "licenses certain systems for preparing and marketing fried chicken and other food products, along with related trademarks and service marks" for use at outlets "across the United States and abroad." (Dkt. No. 14, ¶¶ 1, 4). Plaintiff Franchisee "operates a fast-food outlet located at 119 Maple Street in Potsdam, New York, as a KFC franchised restaurant[.]" (*Id.* ¶ 3). "The sole members of Plaintiff Franchisee are Ray and Cheryl Aley[.]" (*Id.*). "KFC and Aley Restaurant Management, LLC made and entered into" the Franchise Agreement for Plaintiff's Outlet at 119 Maple Street. (*Id.* ¶ 7).

---

[1] These facts are drawn from the Amended Complaint. (Dkt. No. 14). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of N.Y.*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions asserted therein, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Section 3.6 of the Franchise Agreement established Plaintiff's territory as a franchisee. (*See id.* ¶ 20; *see also* Dkt. No. 14-1, at 5). Under section 3.6 of the Franchise Agreement, KFC will not "use or license others to use" the trademarks licensed under the agreement "in the connection with the sale of any food products at any location within a radius of one and one-half miles of the [Plaintiff's] Outlet," unless certain conditions (not pertinent here) are met. (Dkt. No. 14-1, at 5). [2] Section 19 of the Franchise Agreement "pertains to KFC's franchising of new outlets[.]" (Dkt. No. 14, ¶ 10). Under section 19, titled "Right to Apply for New Franchised Outlets[,]" "[b]efore permitting the establishment of any new franchised outlet [ ] at a location closer to [Plaintiff's] Outlet than to any other franchised outlet[,] KFC shall be obligated to give [Plaintiff] 30 days prior written notice of such proposed action. During such 30-day period, [Plaintiff] may apply to KFC for a franchise to operate an outlet at such proposed new location[.]" (Dkt. No. 14-1, at 20-21).

"[I]n addition, KFC promulgated written Guidelines for its franchising of new Outlets which provide that KFC may open a new outlet only if the impact it will have on the gross revenues of the closest existing franchisee's outlet is less than 15%." (Dkt. No. 14, ¶ 10). Under these Guidelines, KFC's actions regarding the opening of a new franchise outlet depend on the results of an impact study. (Dkt. No. 14-2, at 2). The Guidelines include a matrix, which indicates (1) if the potential impact "on any single existing outlet's gross revenue, including multi-brand sales" is less than 10%, the new outlet will be approved; (2) if the potential impact is

---

[2] Defendant points out that Plaintiff attached "an unsigned version of the Franchise Agreement" to the Amended Complaint. (Dkt. No. 17-1, at 5 n.1). Defendant attached "the final, executed version of the Franchise Agreement" to its motion, asserting that it "has the same relevant terms as the unsigned version attached to Plaintiff's complaint, but contains signatures and dates." (*Id.*). Plaintiff does not address why it attached an unsigned version of the Franchise Agreement, and has not challenged Defendant's version. The Court sees no difference in the relevant sections.

between 10-15%, KFC will conduct "further review"; and (3) if the potential impact is more than 15%, the option to open the new outlet will be denied. (*Id.*).

"KFC adopted the Guidelines in 2016 as part of an Incentive Program for encouraging the opening of new outlets by offering financial benefits[.]" (Dkt. No. 14, ¶ 11). To approve the Incentive Program, "KFC required the approval, by vote, of the membership of the KFC National Council and Advertising Cooperative ("NCAC") who would help fund the Incentive Program." (*Id.*). "Some NCAC members expressed concerns that the Incentive Program would cannibalize exi[s]ting outlets, including those who had recently spent substantial sums of money on remodeling and upgrades." (*Id.* ¶ 13). "Therefore, KFC issued the Guidelines to offer existing franchisees protections 'over and above the territory protections in their franchise agreements[.]'" (*Id.* ¶ 14 (citing Dkt. No. 14-3)).[3] KFC "promised and assured its franchises that it would follow and adhere to the Guidelines." (*Id.*).

"With the Guidelines in place, the Incentive Program garnered the required NCAC vote at a meeting of the NCAC in Louisville, Kentucky," including Plaintiff's vote (cast remotely) in favor of the Incentive Program. (*Id.* ¶ 15). Plaintiff "cast its vote in favor of approval of the Incentive Program in reliance on KFC's Guidelines, and its promises and assurances that it would follow and adhere to the Guidelines." (*Id.*). The Guidelines offered franchisees the option to "'request an impact study pursuant to the Impact Study Guidelines' by making a request in writing, signed by the franchisee, and remitting an impact study fee to KFC." (*Id.* ¶ 16).[4]

---

[3] Plaintiff appears to quote a newsletter attached to the Amended Complaint. (Dkt. No. 14-3). However, the Court cannot locate the quoted language in the newsletter. Instead, the newsletter states, "KFC is using Impact Guidelines which helps protect you beyond your Section 19 rights." (*See id.* at 3).

[4] It is unclear what document Plaintiff is quoting here, as this language does not appear in the Guidelines, (Dkt. No. 14-2), or the newsletter, (Dkt. No. 14-3).

KFC promised Plaintiff that it would "perform and abide by the terms and provisions of the Guidelines, and do everything reasonably necessary for it to carry out those terms and provisions, so as to afford protections over and above those provided by their franchise agreements and permit [Plaintiff] to enjoy the fruits and benefits of the License and other terms and provisions of [its] franchise agreement[.]" (*Id.* ¶ 17). KFC made these promises and assurances, "*inter alia*: during a conference call on October 26, 2016 where the upcoming vote on the Incentive Program was discussed," in which Ray Alay participated; "at annual National Conventions of the NCAC" from 2017 through 2020, which Ray Alay attended; "as well as at meetings of the Northeast Regional KFC Franchise Association," which Ray Alay also attended "as Secretary of that Association and as Chairman of the KFC Governmental Affairs and Political Action Committee," from 2016 through 2019. (*Id.*). "KFC further promised and agreed to act in good faith in the performance of its obligations under both the Franchise Agreement and the Guidelines, including by not doing anything which would negate, frustrate, impair, or deprive Franchisee of the fruits and benefits of the Franchise Agreement or the Guidelines." (*Id.* ¶ 18).

"Under the Franchise Agreement and the Guidelines, KFC had certain discretion" regarding licensing new outlets in New York, selecting persons to perform impact studies, "the methodologies to be used in performing impact studies," and "in scrutinizing and acting on the results of such studies[.]" (*Id.* ¶ 19). KFC "held itself out and represented and promised to [Plaintiff] that it would exercise its discretion reasonably and in good faith." (*Id.*). "During the Parties' course of dealing with one another, KFC and [Plaintiff] came to know and understand that the market area for [Plaintiff]'s Outlet consisted of the entirety of St. Lawrence County," and that the market "could *not* likely sustain an additional KFC outlet in Canton, New York, without substantially impacting [Plaintiff]'s Outlet's gross revenues." (*Id.* ¶ 21).

"On June 30, 2020, KFC notified [Plaintiff] that it was considering establishing a new KFC outlet in Canton, New York[.]" (*Id.* ¶ 23). In a writing Plaintiff calls a "Section 19 Letter," referring to section 19 of the Franchise Agreement, KFC advised Plaintiff of "certain rights and obligations it had under the Franchise Agreement, as well as certain rights and obligations it had under the Guidelines, including its right to apply for the right to franchise the New Outlet. (*Id.*). KFC offered Plaintiff "the opportunity to request an impact study, and that if it did, it would have an impact study performed and it would determine whether to license the New Outlet pursuant to the Guidelines, provided that [Plaintiff] request the same in a writing signed by [Plaintiff] called a Request for Impact Study and remit payment of a $6,000 fee[.]" (*Id.* ¶ 26).

"On or about July 10, 2020, in reliance on KFC's Section 19 Letter and the other terms of the Franchise Agreement, in reliance on the Guidelines, and in reliance on the Parties' course of dealing, [Plaintiff] elected not to exercise" its right to apply for the right to franchise the New Outlet. (*Id.* ¶ 24). Plaintiff elected not to exercise that right because Plaintiff "was convinced [the New Outlet] would drastically cannibalize the customers and sales" of Plaintiff's existing Outlet, "and it was confident that a reasonably and prudently prepared impact study would show that the proposed New Outlet would impact [Plaintiff]'s Outlet's gross revenues by far more than 15%[.]" (*Id.*). This conviction was "based not only on" Plaintiff's experience in operating its existing Outlet, but also based on its "extensive knowledge of the St. Lawrence County market" after operating other franchise restaurants "for approximately 19 years." (*Id.*). Plaintiff therefore "accepted KFC's offer to have an impact study performed" and paid the required $6,000 fee. (*Id.* ¶ 25). Plaintiff alleges that its acceptance of "KFC's offer by submitting a signed Request for Impact Study and by remitting the requisite $6,000 fee, thereby create[ed] a contract" which Plaintiff refers to as the "Guideline Agreement". (*Id.* ¶ 26).

"After its receipt of [Plaintiff]'s Request for Impact Study and $6,000 fee, KFC requested that Intalytics, a consulting firm[,] conduct a study regarding the impact the proposed New Outlet would have on the Franchisee's Outlet under KFC's supervision and direction." (*Id.* ¶ 28). "Intalytics conducted an assessment of the projected 'customer transfer' from what it considered to be [Plaintiff]'s Outlet to the New Outlet and prepared a report[,] which it provided to KFC on or about July 30, 2020[.]" (*Id.* ¶ 29). In that report, Intalytics indicated that "the proposed New Outlet would impact [Plaintiff]'s Outlet by approximately 9.7%." (*Id.*).

Plaintiff alleges that "Intalytics's assessment of projected customer transfer was not reasonably or prudently done," and that the resulting report "was not reasonably and prudently prepared[.]" (*Id.* ¶ 31). The report was "based on Massive Mobile Data ("MMD") regarding the location and movement of mobile devices of patrons or potential patrons to and from the geo-fenced boundary in which the [Plaintiff]'s Outlet is located (the "Geo-Fence"). Plaintiff claims that the "analysis is fundamentally flawed is [sic] several respects[.]" (*Id.*).[5] Because the assessment was not reasonably or prudently performed, Plaintiff claims that Intalytics's "projected 9.7% impact of the New Outlet on [Plaintiff]'s outfit was grossly inaccurate and substantially understated." (*Id.* ¶ 32).

"KFC had other sources and means [ ] for assessing and projecting the impact the New Outlet would have on [Plaintiff]'s Outlet's gross sales, including survey-based studies[.]" (*Id.* ¶

---

[5] Specifically, Plaintiff contends that the Geo-Fence includes the "entire complex" containing Plaintiff's Outlet—which also includes a Dunkin Donuts, a convenience store, and fuel pumps—thereby assigning certain customers to Plaintiff's Outlet, even though they are not actually Plaintiff's customers. (*Id.*). Plaintiff also claims that 35% of the "patrons or the potential patrons included in the MMD used for the Intalytics report were captured during times of the day" that Plaintiff's Outlet was not open. (*Id.*). Third, "a substantial number of the patrons or potential patrons visited the complex far more frequently than KFC customers do, for daily visits to the Dunkin Donuts for coffee or weekly visits to the fuel pumps[.]" (*Id.*). Finally, Plaintiff appears to claim that there was an error in Intalytics's application of "the key convenience factor[,]" because "a substantial percentage of the customers which live close to the proposed New Outlet would have to choose to go far out their way to continue to visit Plaintiff's Outlet" in order for the impact of the New Outlet to be "limited to 9.7%" as predicted by the report. (*Id.*).

33). KFC also had notice of "flaws and deficiencies in the impact assessments" performed in the past "by at least one of the analysts it regularly used to perform survey-based studies," the James Andrew Group. (*Id.* ¶ 34). After that group completed an impact analysis of a KFC outlet in Pueblo, Colorado in June of 2019, the Pueblo outlet had an independent study performed, which identified "such flaws and deficiencies[.]" (*Id.*). The Pueblo outlet delivered their independent impact study to KFC in or about September of 2019." (*Id.*).

Upon receipt of the Intalytics impact assessment, Ray Alay "questioned and challenged the methodology used and accuracy of the findings and conclusions and, specifically, the projected impact[.]" (*Id.* ¶ 38). On August 7, 2020, Mr. Alay was referred to the Associate Manager of Market Planning at KFC. (*Id.*). The Associate Manager "attempted to defend" the assessment, and Mr. Alay "asked for a second analysis and opinion regarding the actual impact the New Outlet would have on [Plaintiff]'s Outlet's gross sales." (*Id.*). The Associate Manager referred Mr. Alay to KFC's Legal Director, and on September 22, 2020, the Legal Director "advised that KFC had or would license the New Outlet." (*Id.*).

The New Outlet opened in December of 2021. (*Id.* ¶ 40). While the Intalytics report projected that the impact on Plaintiff's Outlet would be 9.7%, "the *actual* impact the New Outlet has had since it opened has been, at a minimum, 38%, and as much as 47%[.]" (*Id.* ¶ 2). Plaintiff alleges that KFC acted to add the New Outlet "for its own financial gain regardless of the consequences" to Plaintiff, (*id.* ¶ 54), and that KFC "intended the Guidelines to be gratuitous, and that they not be binding on it or enforceable against it by Franchisee, so that it could open the New Outlets in violation of the Guidelines if it saw fit," (*id.* ¶ 27). Plaintiff alleges that KFC deprived Plaintiff of "the fruits and benefits" of the Franchise Agreement, the Guidelines, and the Guideline Agreement. (*Id.* ¶ 14).

III.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a

complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'"

*Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations

sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S.

at 555). A court must accept as true all factual allegations in the complaint and draw all

reasonable inferences in the plaintiff's favor. See *EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir.

2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

However, "the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

IV.    DISCUSSION

   A.    **Breach of Contract**

      1.    **Franchise Agreement**

KFC moves to dismiss Plaintiff's claim for breach of the Franchise Agreement, because

"Plaintiff does not (and cannot) identify any contractual provision that KFC allegedly breached

by licensing a new restaurant approximately nine miles away" from Plaintiff's Outlet. (Dkt. No.

17-1, at 8). Plaintiff disagrees, arguing that KFC breached the Franchise Agreement because that

agreement "requires that KFC exercise its discretion to open new outlets beyond the 1.5-mile

limit in good faith[,]" "so as not to deprive [Plaintiff] of the fundamental fruits and benefits of

the Franchise Agreement, i.e. the right and ability to operate a viable, sustainable outlet." (Dkt.

No. 21, at 15).

The Parties' Franchise Agreement contains a "Governing Law" provision, which states

that the Franchise Agreement "has been made and accepted in Kentucky, and it shall be

interpreted in accordance with and governed by the laws of the State of Kentucky and any

applicable state franchise laws," (Dkt. No. 14-4, at 22), and the parties appear to agree that

Kentucky law governs the Franchise Agreement.[6]

To state a claim for breach of contract under Kentucky law, a plaintiff "must allege (1)

the existence of a contract, (2) a breach of that contract, and (3) that the breach caused damages."

*EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019). A plaintiff must

also "identify a 'contractual basis' for the claim, including the specific terms of the contract

allegedly breached." *Nationwide Mut. Fire Ins. Co. v. Castle*, No. 13-cv-25, 2013 WL 5503056,

at *3, 2013 U.S. Dist. LEXIS 142484, at *8 (E.D. Ky. Oct. 2, 2013); *see also Smith v. Westlake*

*Vinyls, Inc.*, 403 F. Supp. 3d 625, 635 (W.D. Ky. 2019) ("It is a basic tenet of contract law that a

party can only advance a claim of breach of written contract by identifying and presenting the

actual terms of the contract allegedly breached." ).

Here, Plaintiff does not identify a term of the Franchise Agreement that KFC breached.

The Franchise Agreement provides Plaintiff a 1.5-mile territory inside which KFC will not use or

license others to use its trademarks under the agreement. (*See* Dkt. No. 14-1, at 5). Plaintiff does

not allege that the New Outlet is within that 1.5-mile radius.[7] Section 19 of the Franchise

Agreement also provides that KFC must give notice if it intends to open a New Outlet "closer to

the [Plaintiff's] Outlet than to any other franchised outlet[,]" and that Plaintiff could "apply to

KFC for a franchise" to operate at the new location. (*Id.* at 21). Plaintiff alleges that it received a

letter notifying it of KFC's intent to open the New Outlet, and that Plaintiff declined the offer to

---

[6] Where the parties have proceeded under the assumption that Kentucky law applies, the Court will not address choice of law sua sponte. *See Henneberry v. Sumitomo Corp. of Am.*, No. 04-cv-2128, 2005 WL 991772, at *5 n.3, 2005 U.S. Dist. LEXIS 7475, at *14 n.3 (S.D.N.Y. Apr. 27, 2005).

[7] Defendants point out that the New Outlet is approximately nine miles away from Plaintiff's Outlet. (Dkt. No. 17-1, at 6 n.3). According to Google Maps, there is only one KFC located in Canton, NY, and the shortest driving distance between that KFC and the location at 119 Maple Street in Potsdam is 9.2 miles. The Court may take judicial notice of distance as reported by online maps. *United States v. Melhuish*, 6 F.4th 380, 388 (2d Cir. 2021).

apply to KFC for a franchise at the new location. (Dkt. No. 14, ¶¶ 23-24). Because Plaintiff does

not identify any term of the Franchise Agreement Plaintiff breached, Plaintiff's breach of

contract claim must be dismissed with respect to the Franchise Agreement. *See Smith*, 403 F.

Supp. 3d at 635 ("The bare bones statement that a defendant breached a contract, unaccompanied

by any other support or factual allegation, is simply not enough to survive a motion to dismiss.").

### 2.    Guideline Agreement

KFC also moves to dismiss Plaintiff's claim for breach of the "Guideline Agreement"

because "Plaintiff does not (and cannot) allege that KFC breached any part of that agreement."

(Dkt. No. 17-1, at 10). Further, KFC notes that the Guideline Agreement "does not contain any

provision requiring a particular impact study methodology or provider[,]" or for a "second

opinion." (*Id.* at 11). Plaintiff disagrees, primarily because Plaintiff alleges bad faith on the part

of KFC. (*See* Dkt. No. 21, at 16-22).

The Parties have not discussed what law applies to the Guideline Agreement. Plaintiff

notes that the Guideline Agreement "lacks a Kentucky choice of law clause," and suggests that

this Court might determine that New York law applies to the claims relating to the Guideline

Agreement. (*See* Dkt. No. 21, at 15 n.2). However, both parties have only briefed the breach of

contract issues under Kentucky law; where the parties assume Kentucky law applies, the Court

will not address choice of law sua sponte. *See Henneberry*, 2005 WL 991772, at *5 n.3, 2005

U.S. Dist. LEXIS 7475, at *14 n.3.[8]

---

[8] In any event, the elements of a breach of contract claim are substantially the same under either New York or
Kentucky law. *Compare Canzona v. Atanasio*, , 989 N.Y.S.2d 44, 47 (2d Dep't 2014) ("The essential elements of a
breach of contract cause of action are 'the existence of a contract, the plaintiff's performance pursuant to the
contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach.'"
(quoting *Dee v. Rakower*, 112 A.D.3d 204, 208–29, 976 N.Y.S.2d 470 (2d Dep't 2013))) *with EQT Prod. Co.*, 590
S.W.3d at 293 ("To state a claim for breach of contract under Kentucky law, a plaintiff "must allege (1) the existence
of a contract, (2) a breach of that contract, and (3) that the breach caused damages."). And under either New York or
Kentucky law, in order to "allege the 'breach' element of a breach of contract claim, a plaintiff must 'identify, in
non-conclusory fashion, the specific terms of the contract that a defendant has breached.'" *Glover v. Bob's Disc.*

But here again, Plaintiff does not identify what provision of the Guideline Agreement KFC supposedly breached. Plaintiff alleges that KFC offered Plaintiff the opportunity to request an impact study, which Plaintiff did. (*See* Dkt. No. 14, ¶ 26). Plaintiff alleges that KFC agreed to "determine whether to license the New Outlet pursuant to the Guidelines" promulgated by KFC, (*see id.*), which indicated that the New Outlet would not open if an impact study showed that the potential impact on Plaintiff's Outlet's gross revenue would be more than 15%, (Dkt. No. 14-2, at 2). According to Plaintiff, KFC had a third party conduct an impact study that predicted a potential impact of less than 10% on Plaintiff's Outlet. (Dkt. No. 14, ¶ 29).

Plaintiff does not point to any term of the Guideline Agreement[9] or any express provision of the Guidelines, that requires any other action on the part of KFC. Instead, Plaintiff repeats, in a conclusory manner, that KFC "intended the Guidelines be gratuitous" so that KFC "could open the New Outlets in violation of the Guidelines[,] and that KFC "has breached the Guideline Agreement." (*Id.* ¶¶ 27, 48). The Court considers whether KFC breached an *implied* covenant of good faith and fair dealing below. But because Plaintiff has not alleged a breach of any term of the Guideline Agreement, Plaintiff's claim for breach of contract of that Agreement must be dismissed.

**B.    Implied Covenant of Good Faith and Fair Dealing**

KFC moves to dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, for three reasons: (1) there is no "standalone" claim for breach of the implied covenant under Kentucky law; (2) the Franchise Agreement unambiguously allows KFC to open

---

*Furniture, LLC*, 621 F. Supp. 3d 442, 451 (S.D.N.Y. 2022) (quoting *Wallert v. Atlan*, 141 F. Supp. 3d 258, 286 (S.D.N.Y. 2015)). *Compare id. with Nationwide Mut. Fire Ins. Co.*, 2013 WL 5503056, at *3, 2013 U.S. Dist. LEXIS 142484, at *8.

[9] Plaintiff alleges that the Guideline Agreement was created when Plaintiff requested the impact study in a writing and remitted the requisite $6,000 fee. (Dkt. No. 14, ¶ 26). There is no written agreement before the Court; Plaintiff has only provided the Guidelines promulgated by KFC. (*See* Dkt. No. 14-2).

the new restaurant; and (3) the Amended Complaint does not allege "bad faith" conduct by KFC that "violated a contractual expectation" under the Guideline Agreement. (Dkt. No. 17-1, at 11-14). Here again, the parties appear to assume Kentucky law applies.

### 1.     Breach of Implied Covenant Without a Breach of a Term in the Contract

First, KFC argues that "multiple Kentucky law authorities hold that a Plaintiff may not allege a violation of the implied covenant that is divorced from an alleged breach of an express term of a contract." (Dkt. No. 17-1, at 11). Plaintiff disagrees, arguing that Kentucky courts permit a claim for breach of the implied covenant of good faith and fair dealing even where there is no showing of breach of contract. (Dkt. No. 21, at 17).[10]

Under Kentucky law, "[w]ithin every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Tr. Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005). "The covenant of good faith is an obligation owned by both parties, and breach of this covenant can be the basis of a viable breach of contract claim." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 196 (6th Cir. 2015) (applying Kentucky law).

"A party can violate the implied covenant of good faith and fair dealing even without breaching any specific provisions of a contract." *Clubspecialists Int'l LLC v. Keeneland Ass'n, Inc.*, No. 16-cv-345, 2017 WL 522945, at *4, 2017 U.S. Dist. LEXIS 17523, at *11 (E.D. Ky. Feb. 8, 2017). *See also O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 457 (6th Cir. 2005) ("In order to show a violation of the implied covenant of good faith and fair dealing, a showing of breach of contract is ordinarily not required[.]"); *PBI Bank, Inc. v. Signature Point*

---

[10] As with the breach of contract claims above, the parties appear to assume Kentucky law applies, because they have only briefed the implied covenant claims under Kentucky law. Therefore, the Court will not conduct a choice of law analysis. *See Henneberry*, 2005 WL 991772, at *5 n.3, 2005 U.S. Dist. LEXIS 7475, at *14 n.3.

*Condominiums LLC*, 535 S.W.3d 700, 718 (Ky. Ct. App. 2016) ("In order to show a violation of the implied covenant of good faith and fair dealing, a showing of breach of contract is ordinarily not required; rather, the party asserting the violation must 'provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" (quoting 23 *Williston on Contracts* § 63:22 (4th ed. 2004))).

Plaintiff distinguishes its claims from the cases cited by KFC, such as *J.S. v. Berla*, 456 S.W.3d 19 (Ct. App. Ky. 2015), because "*Berla* did not involve a party's exercise of discretionary rights under a contract; rather, the court found there was no independent cause of action for breach of the Implied Covenant against a psychologist appointed to conduct a custody evaluation because 'Kentucky law does not recognize an independent *tort* for breach of good faith and fair dealing outside of insurance contracts.'" (Dkt. No. 21, at 17 (citing *Berla*, 456 S.W.3d 25-26)).[11] While the Court in *Berla* noted that "violation of the good faith covenant alone does not give rise to an independent cause of action," it then cited *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F. Supp. 2d 629, 634 (6th Cir. 2014), for the proposition that there is no independent *tort* for breach of good faith and fair dealing outside of insurance contracts. *See Berla*, 456 S.W.3d at 25-26 (citing *Crestwood Farm Bloodstock*, 864 F. Supp. 2d at 634).

---

[11] "A claim for breach of a covenant of good faith and fair dealing may be brought in contract or in tort." *Buridi v. Branch Banking & Tr. Co.*, No. 12-cv-00486, 2013 WL 1309763, at *6, 2013 U.S. Dist. LEXIS 40967, at *18 (W.D. Ky. Mar. 25, 2013). "A separate tort claim for bad faith 'arises from a violation of a duty to act in good faith that is imposed by the common law, not by the terms of the contract.'" *Hargis*, 785 F.3d at 196 (6th Cir. 2015). But "[n]ot all contracts impose a duty that, if breached in bad faith, may be remedied in tort." *Buridi*, 2013 WL 1309763 at *6, 2013 U.S. Dist. LEXIS 40967, at *18 (citation omitted); s*ee also Babbs v. Equity Grp. Kentucky Div. LLC*, No. 19-cv-00064, 2019 WL 5225471, at *2, 2019 U.S. Dist. LEXIS 178677, at *5 (W.D. Ky. Oct. 16, 2019) ("Under well-established Kentucky law, an independent tort claim based on breach of the implied covenant of good faith and fair dealing is actionable where a special relationship exists between the parties, namely in the context of insurance contracts.").

Here, Plaintiff has alleged that KFC's actions breached the implied covenant of good faith and fair dealing by depriving Plaintiff of the fruits and benefits of the Franchise Agreement and the Guideline Agreement. (*See*, *e.g.*, Dkt. No. 14, ¶¶ 51-54). KFC acknowledges "that some decisions applying Kentucky law have permitted a claim based on a violation of the implied covenant separate from a breach of an express term." (Dkt. No. l7-1, at 12 n.6). The Court agrees and, at this stage of the proceeding, declines to preclude Plaintiff's claims in contract for breach of the implied covenant of good faith and fair dealing based on the absence of a breach of a term in the contract.

### 2.    Franchise Agreement

KFC argues that Plaintiff's implied covenant claim fails with respect to the Franchise Agreement because "the Franchise Agreement unambiguously allowed KFC to approve a new location more than 1.5 miles away from Plaintiff's restaurant." (Dkt. No. 17-1, at 12). KFC points to the Tenth Circuit's decision in a case involving an identical franchise agreement, *Kazi v. KFC US, LLC,* 76 F.4th 993 (10th Cir. 2023) (*Kazi II*), rejecting an analogous implied covenant of good faith and fair dealing claim. Plaintiff argues that, "[n]otwithstanding the Tenth Circuit's decision in [*Kazi II*], Franchisee maintains that KFC breached the Franchise Agreement" because that agreement "requires that KFC exercise its discretion to open new outlets beyond the 1.5-mile limit in good faith so as not to deprive Franchisee of . . . the right and ability to operate a viable, sustainable outlet." (Dkt. No. 21, at 15).

"In order to show a violation of the implied covenant of good faith and fair dealing . . . the party asserting the violation must 'provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *PBI Bank, Inc.*, 535 S.W.3d at 718 (quoting 23

*Williston on Contracts* § 63:22); *see also O'Kentucky Rose B. Ltd. P'ship*,147 F. App'x at 457-58.

"A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove." *PBI Bank, Inc.*, 535 S.W.3d at 718 (quoting *Ligon v. Parr*, 471 S.W.2d 1, 3 (Ky. 1971)). "The implied covenant of good faith and fair dealing requires a party vested with contractual discretion to 'exercise that discretion reasonably and with proper motive, and [not] arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop. Corp.*, No. 15-cv-45, 2015 WL 4464105, at *4, 2015 U.S. Dist. LEXIS 94372, at *12 (W.D. Ky. July 21, 2015). However, "[i]t is not [ ] a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained." *Travelers Ins. Co. v. Corporex Properties, Inc.*, 798 F. Supp. 423, 425 (E.D. Ky. 1992). The implied covenant "does not preclude a party from enforcing the terms of the contract." *Id.*

KFC relies on *Kazi II,* where the Tenth Circuit considered an almost identical agreement. The franchise agreement in *Kazi II* provided that "(1) under § 3.6, KFC [was] prohibited from licensing a new store within a 1.5-mile radius of Mr. Kazi's restaurant, creating an exclusivity zone of about seven square miles; and (2) under § 19, if Mr. Kazi's restaurant [was] the closest to a proposed new location, KFC [was] required to (a) give Mr. Kazi 30 days' written notice before approving the proposed restaurant, (b) allow Mr. Kazi to apply to operate it, and (c) negotiate in good faith regarding that application." 76 F.4th at 996. *Compare id. with* (Dkt. No. 14-1, at 5 (providing 1.5-mile exclusive radius), 20-21 (providing Plaintiff right to 30 days' notice and opportunity to apply to operate new outlet, if Plaintiff's Outlet is the nearest to proposed new

outlet)). Plaintiff responds that this Court "is not bound by another federal circuit court's judgment on matters of federal law or on matters of state law, where, as here, the circuit court's decision addressed matters of state law from a state outside of its circuit." (Dkt. No. 21, at 14 (citing *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 90 (2d Cir. 2006), *aff'd sub nom. Warner-Lambert Co., LLC v. Kent*, 552 U.S. 440, 128 S. Ct. 1168 (2008))).[12] Although Kentucky is not in the Tenth Circuit and the Court is not bound by *Kazi*, the Court affords it "due consideration and weight." *McLeod for & on Behalf of N. L. R. B. v. Am. Fed'n of Television & Radio Artists, New York Loc.*, 234 F. Supp. 832, 838 (S.D.N.Y. 1964), *aff'd,* 351 F.2d 310 (2d Cir. 1965).

The court in *Kazi II* noted that the franchise agreement said "nothing to imply that KFC is restricted in granting licenses for new locations outside that circle," and "on the contrary, to state that [the franchisee had] exclusive rights within the area is to imply that he has no exclusionary rights outside it." 76 F.4th at 1003. The court explained that this implication was strengthened by the franchisee's right, under the franchise agreement, to negotiate for a franchise if his restaurant was closest to the new outlet. *Id.* The *Kazi II* court held that, "under Kentucky law, to bring a claim for breach of the implied duty of good faith and fair dealing, the party must point to an expectation created by the language of the contract . . . that was defeated by the bad faith of the other party." *Id.* Because the franchisee could not make such a showing, the franchisee's claim of breach of the implied covenant was "barred as a matter of law[.]" *Id.*[13]

Plaintiff argues that the *Kazi II* court "did not address [Plaintiff's] reasonable expectation of protection against Franchisor cannibalism and the resultant loss of [its] ability to operate a

---

[12] This is not a precise recitation of the holding in *Desiano*. The *Desiano* court reiterated the holding in *Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278, 283 (2d Cir. 1981), noting that the court will "defer conclusively to another circuit's judgment only when that court of appeals' decision addressed questions of *state* law from a state within that circuit." *Desiano*, 467 F.3d at 90.

[13] The *Kazi* court also noted that "cases in other circuits involving similar franchise agreements strongly support the proposition that if the franchise agreement addresses encroachment, the franchisee cannot invoke the food-faith covenant to expand its protections against encroachment beyond the contract terms." 76 F. 4th at 1004.

viable, sustainable restaurant." (Dkt. No. 21, at 15). But Plaintiff does not point to any language in the Franchise Agreement supporting this argument. In fact, the Franchise Agreement expressly provided that "the success of the business venture contemplated [by the Franchise Agreement] involve[d] substantial risks . . . and no assurance or warranty, express or implied, has been given as to the potential success of such business venture or the gross revenues, volume or earnings likely to be achieved[.]" (Dkt. No. 14-1, at 3).

As the court noted in *Kazi II*, "KFC had full discretion to refrain from licensing a new franchise outside the exclusive area (subject to the restrictions in § 19), but no duty of good faith and fair dealing confined that discretion." 76 F.4th at 1006. In support of its argument to the contrary, Plaintiff has cited caselaw from the Ninth and Eleventh Circuits, as well as a New York Supreme Court case in Nassau County—but no cases applying Kentucky law. (*See* Dkt. No. 21, at 15-16). The Court agrees with the holding in *Kazi II*: Plaintiff has not alleged facts sufficient to support a finding that KFC denied Plaintiff "the benefit of the bargain originally intended by the parties.'" *See PBI Bank, Inc.*, 535 S.W.3d at 718. Therefore, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing must be dismissed with respect to the Franchise Agreement.

### 3. Guideline Agreement

The Guideline Agreement is another matter. As Plaintiff points out, the court in *Kazi II* did not consider a "Guideline Agreement" as alleged here. (*See* Dkt. No. 21, at 20 n. 5).[14] KFC argues that Plaintiff's implied covenant claim must be dismissed with respect to the Guideline Agreement, because it does not sufficiently allege (1) "an expectation created by the language of

---

[14] On KFC's motion to dismiss, the trial court in *Kazi* dismissed the franchisee plaintiff's express breach of contract claim, because he did not allege "sufficient facts to suggest that the parties modified the contract to incorporate the guidelines" promulgated by KFC. *Kazi v. KFC US, LLC*, No. 19-cv-03300, 2020 WL 6680361, at *6, 2020 U.S. Dist. LEXIS 211285, at *15 (D. Colo. Nov. 12, 2020) ("*Kazi I*").

the contract" that was (2) "defeated by the bad faith of the other party." (Dkt. No. 17-1, at 13

(citing *Kazi II*, 76 F.4th 1003)). Plaintiff disagrees, arguing that while Plaintiff "may not have

expected a particular impact analyst, it certainly expected that KFC would select a competent,

qualified one, and while Franchisee may not have expected a specific methodology, it certainly

expected a reasonable one." (Dkt. No. 21, at 18). Instead, Plaintiff argues, KFC breached the

implied covenant with respect to the Guideline Agreement "by engaging a vendor who 'told KFC

what it wanted to hear,' so to speak, by conducting a fundamentally, drastically, flawed impact

study[.]" (*Id.* at 19).

To successfully allege a violation of the implied covenant, as noted above, a party must

"provide evidence sufficient to support a conclusion that the party alleged to have acted in bad

faith has engaged in some conduct that denied the benefit of the bargain originally intended by

the parties.'" *PBI Bank, Inc.*, 535 S.W.3d at 718. "The implied covenant of good faith and fair

dealing requires a party vested with contractual discretion to 'exercise that discretion reasonably

and with proper motive, and [not] arbitrarily, capriciously, or in a manner inconsistent with the

reasonable expectations of the parties.'" *Time Warner Cable Midwest LLC*, 2015 WL 4464105, at

*4, 2015 U.S. Dist. LEXIS 94372, at *12. *See also Pearman v. West Point Nat. Bank*, 887

S.W.2d 366, 368 (Ky. Ct. App. 1994) (holding that bank's "failure to adopt a course that would

have liquidated its customer's debt in the entirety and choosing instead to seize an advantageous

business opportunity was a breach of its good faith obligation[,]" where bank "contracted with

third parties [ ] to sell the mortgaged property during the foreclosure action and, in fact,

ultimately sold same for an amount which would have wholly satisfied the debt" owed by

plaintiff).

Plaintiff alleges that the Guideline Agreement was created by its acceptance of KFC's offer to have an impact study performed "by submitting a signed Request for Impact Study and by remitting the requisite $6,000 fee[.]" (Dkt. No. 14, ¶ 26). KFC was, therefore according to Plaintiff, bound to "determine whether to license the New Outlet pursuant to the Guidelines[.]" (*Id.*). This agreement, as alleged by Plaintiff, is silent on the manner in which the impact assessment would be performed.

Plaintiff alleges that "Intalytics's assessment of projected transfer was not reasonably or prudently done," the report "was not reasonably and prudently prepared," and "its analysis was fundamentally flawed [in] several respects[.]" (Dkt. No. 14, ¶ 31). Plaintiff asserts that, as a result, the impact assessment "was grossly inaccurate and substantially understated." (*Id.* ¶ 32). But while Plaintiff points to several alleged flaws in the methodology of Intalytics's assessment, Plaintiff does not plausibly allege that KFC should (or would) have known about them. Plaintiff asserts that KFC "had notice" of flaws in the impact assessments performed by another analyst it regularly used—the James Andrew Group—but not Intalytics. (*See id.* ¶ 34). Moreover, Plaintiff alleges that the James Andrew Group used a different method for conducting its allegedly flawed impact assessments, because the James Andrew Group relied on "survey-based studies" instead of the MMD used by Intalytics. (*See id.*). Not only did KFC use a different analyst for Plaintiff's study, that analyst also used a different methodology. There are no facts alleges supporting Plaintiff's conclusory allegations that "by the time [KFC] commissioned Intalytics to do the Impact Study for [Plaintiff]'s Outlet, KFC knew or should have known of the [ ] fundamental flaws and deficiencies in Intalytics' methodology[,]" or that "KFC knew, was substantially certain, or at a minimum had notice of the fact that the results of the Intalytics Impact Study would be grossly inaccurate and substantially understated." (*See id.* ¶¶ 35, 37).

20

Drawing all inferences in Plaintiff's favor, Plaintiff has failed to plausibly allege that KFC acted "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties," *See Time Warner Cable Midwest LLC*, 2015 WL 4464105, at *4, 2015 U.S. Dist. LEXIS 94372, at *12. Therefore, Plaintiff's claim for breach of the implied covenant with respect to the Guideline Agreement must be dismissed. *See In re Merrill Lynch Auction Rate Sec. Litig.*, 886 F. Supp. 2d 340, 344 (S.D.N.Y. 2012), *aff'd sub nom. Cellular S. Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 516 F. App'x 30 (2d Cir. 2013) ("Here, Plaintiff's allegations would require the Court to pile inference upon inference and they therefore "stop[ ] short of the line between possibility and plausibility of entitlement to relief." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).

## C.        Promissory Estoppel and Unjust Enrichment

KFC argues that Plaintiff's "quasi-contract theories of promissory estoppel and unjust enrichment" must be dismissed, because "where (as here) a written contract governs the subject matter complained of in quasi-contract, the equitable claims must be dismissed." (Dkt. No. 17-1, at 15 (citing *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 773 (E.D. Ky. 2019))). Plaintiff disagrees, arguing that its quasi-contract claims "are governed by New York law as the state that has the most significant relationship to the parties' relationship, and that, "under either New York or Kentucky law, Plaintiff is permitted to plead its claims for promissory estoppel and unjust enrichment [ ] *in the alternative*." (Dkt. No. 21 at 22–23).

"In diversity actions, federal courts follow the choice-of-law rules of the forum state to determine the controlling substantive law." *Feldman L. Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 255 (S.D.N.Y. 2011), *aff'd*, 476 F. App'x 913 (2d Cir. 2012). But "[u]nder New York choice of law rules, the first inquiry in a case presenting a potential choice of law issue is

whether there is an actual conflict of laws on the issues presented. If not, no choice of law analysis is necessary." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (internal citations omitted). The Court will thus first consider whether there is a conflict between New York and Kentucky law before conducting a choice of law analysis.

### 1.    Availability of Quasi-Contract Claims

Under New York law, "[p]romissory estoppel ... is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason." *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 500 (S.D.N.Y. 2023) (quoting *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 361 (S.D.N.Y. 2017)). "Therefore, '[t]he existence of a valid and enforceable contract governing a particular subject matter precludes recovery under a promissory estoppel cause of action arising out of the same subject matter.'" *Id.* (quoting *Bennett v. State Farm Fire & Cas. Co.*, 181 A.D.3d 777, 778, 121 N.Y.S.3d 298 (2d Dep't 2020). As such, "[c]ourts dismiss promissory estoppel claims as duplicative 'unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract.'" *Id.* (quoting *Hallett v. Stuart Dean Co.*, 481 F. Supp. 3d 294, 307 (S.D.N.Y. 2020)). Similarly, under New York law "[u]njust enrichment is a quasi-contract claim viable only in the absence of an enforceable agreement between the parties governing the subject matter of the dispute." *DeCoursey v. Murad, LLC*, 673 F. Supp. 3d 194, 219 (N.D.N.Y. 2023) (quoting *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010)). And, as with promissory estoppel, an unjust enrichment claim may survive a motion to dismiss where the parties dispute "the enforceability of an alleged contract." *Id.*

The case law in Kentucky largely mirrors the law in New York. Under Kentucky law, a plaintiff may plead promissory estoppel and unjust enrichment in the alternative, but may not bring "a claim for promissory estoppel if there is a valid contract that covers the same subject matter." *Certified Flooring Installation, Inc. v. Young*, No. 23-cv-158, 2024 WL 2060852, at *4, 2024 U.S. Dist. LEXIS 81988, at *11 (E.D. Ky. May 6, 2024). Kentucky law also "precludes recovery for unjust enrichment when an explicit contract is the subject of the dispute[,]" *Graves v. Standard Ins. Co.*, No. 3:14-CV-00558-CRS, 2016 WL 4445479, at *2, 2016 U.S. Dist. LEXIS 111035, at *4 (W.D. Ky. Aug. 19, 2016), but permits a plaintiff to "pursue breach of contract and unjust enrichment as alternative theories of liability based on the same core facts[.]" *Walters v. Gill Indus., Inc.*, 586 F. Supp. 3d 633, 645 (E.D. Ky. 2022).[15] *Compare Young, Graves, and Walters with WCA Holdings III*, 704 F. Supp. 3d at 500 ("[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue." (quoting *Dart Brokerage Corp. v. Am. Comm. Ins. Co.*, No. 13-cv-04015, 2013 WL 5966901, at *2, 2013 U.S. Dist. LEXIS 160219, at *5 (S.D.N.Y. Nov. 7, 2013))). The Court must therefore consider, under either New York or Kentucky law, (1) whether the parties dispute the validity of the Franchise Agreement or the Guideline Agreement, or (2) whether those agreements cover the subject matter of their dispute. *See id.*

The parties do not dispute the validity or enforceability of the Franchise Agreement, which governs (and specifically addresses) KFC's right to open new outlets and Plaintiff's right to a 1.5-mile exclusive territory, (*see* Dkt. No. 14-1, at 5, 21), but this agreement does not

---

[15] KFC asserts that "Kentucky courts preclude claims in quasi-contract when a written agreement exists, *even if* those claims are alleged in the alternative and *even if* a court rejects the contract-based claims." (Dkt. No. 22). This does not appear to comport with the case law. *See Walters*, 586 F. Supp. 3d at 645.

address KFC's performance of an impact study. That obligation, according to Plaintiff's allegations, arose *later*—when KFC and Plaintiff entered into the Guideline Agreement. But KFC "does not agree that there is a 'Guideline Agreement' as described in the pleading[.]" (Dkt. No. 17-1, at 10 n. 5). In other words, KFC disputes the validity of that alleged agreement. Therefore, Plaintiff may plead its quasi-contract claims in the alternative. *See Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 214–15 (S.D.N.Y. 2021) ("In light of HSBC's challenge to the existence of a valid and enforceable contract, Lamda may plead alternative claims for promissory estoppel."); *Wade Farms, LLC v. Ceed2Med, LLC*, No. 19-cv-124, 2020 WL 1452709, at *2, 2020 U.S. Dist. LEXIS 52739, at *5 (W.D. Ky. Mar. 25, 2020) ("[T]his Court has also recognized that in the early stages of litigation, when it has not yet been determined whether there is an enforceable contract between the parties, it is proper for a party to allege claims for unjust enrichment and breach of contract in the alternative." (quoting *United Parcel Serv. Co. v. DNJ Logistic Grp., Inc.*, No. 16-cv-00609, 2017 WL 3097531, at *9, 2017 U.S. Dist. LEXIS 112860, at *27 (W.D. Ky. July 20, 2017))). *See also St. John's*, 757 F. Supp. 2d at 183-84 ("[T]he threshold question is whether an enforceable contract exists that governs the subject matter underlying the unjust enrichment claim. Though [the d]efendants may well establish that the conduct underlying these claims should be governed by the [contracts], [d]efendants may also establish that no valid contracts exist or that the breaches alleged by Plaintiff were not breaches of duties governed by the contracts.").

### 2.    Sufficiency of Quasi-Contract Claims

Separately, KFC argues that Plaintiff's promissory estoppel and unjust enrichment claims should be dismissed because "they do not allege any coherent theory of quasi-contract." (Dkt. No. 17-1, at 15). Plaintiff disagrees. (Dkt. No. 21, at 21-26). Here again, both parties argue that

they would prevail under either New York or Kentucky law, (*See* Dkt. Nos. 21, at 22-26; 22, at 9-10), so no choice of law analysis is necessary," *See Fed. Ins. Co.*, 639 F.3d at 566.

The elements of a promissory estoppel claim are largely the same under both state law standards. *Compare Aleem v. Experience Hendrix, L.L.C.*, 413 F. Supp. 3d 251, 259-260 (S.D.N.Y. 2019) ("Promissory estoppel requires a plaintiff to prove three elements: '(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury to the relying party as a result of the reliance.'" (quoting *Marvin Inc. v. Albstein*, 386 F. Supp. 2d 247, 253–54 (S.D.N.Y. 2005))) *with Sawyer v. Mills*, 295 S.W.3d 79, 89 (Ky. 2009), *as modified* (Nov. 2, 2009) ("The doctrine of promissory estoppel provides as follows: 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" (quoting *Meade Constr. Co. v. Mansfield Commercial Elec., Inc.,* 579 S.W.2d 105, 106 (Ky.1979))).

Plaintiff alleges that KFC "promised and assured its franchises that it would follow and adhere to the Guidelines," "do everything reasonably necessary for it to carry out those terms and provisions," and "to act in good faith in the performance of its obligations under the Franchise Agreement and the Guidelines[.]" (Dkt. No. 14, ¶¶ 14, 17, 18). Even assuming that these allegations sufficiently allege a "promise" on the part of KFC, Plaintiff has failed to plead an unconscionable injury for all the reasons it failed to plead a breach of the implied covenant of good faith and fair dealing. *See* discussion *supra* section IV.B.3. Put differently, Plaintiff has not plausibly alleged facts supporting an inference that KFC acted inconsistently with its promises. *See Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 386 (S.D.N.Y. 2014) ("Plaintiff has not plausibly alleged that it suffered injury as a result of reasonable reliance on a promise Defendants

made. As described above, even assuming that the [letter of intent] constitutes a sufficiently 'clear and unambiguous promise' to negotiate in good faith, the Complaint does not plausibly allege that Defendants failed to act in good faith. Plaintiff thus cannot plausibly allege that it suffered an actionable 'injury' as a result of reliance on Defendants' promise, because it has not plausibly alleged that Defendants acted in a way inconsistent with that promise."). Therefore, Plaintiff's estoppel claim must be dismissed.

Likewise, the elements of an unjust enrichment claim are essentially the same under New York or Kentucky law. *Compare St. John's*, 757 F. Supp. 2d at 182 ("Under New York law, '[t]o make out a claim for unjust enrichment, a plaintiff must establish, (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N. J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006))) *with Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 777–78 (Ky. 2017) ("To recover on a claim of unjust enrichment a plaintiff is required to 'prove the following three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of [that] benefit without payment for its value.'" (quoting *Furlong Dev. Co. v. Georgetown-Scott Cty. Planning & Zoning Comm'n,* 504 S.W.3d 34, 39-40 (Ky. 2016))).

Plaintiff alleges that "KFC has received financial and other commercial benefits from its franchise of [Plaintiff]'s Outlet and the New Outlet and their respective operations under circumstances such that it would be unjust for [KFC] to retain those benefits without payment therefore." (Dkt. No. 14, ¶ 64). But here again, Plaintiff has failed to allege facts supporting an inference that KFC acted in bad faith, as required by Kentucky law, *see Garvin v. Ethicon, Inc.*, 616 F. Supp. 3d 658, 668 (W.D. Ky. 2022) ("For the retention of the benefit to be 'inequitable,'

Kentucky courts require a showing of bad faith.")—let alone tortiously or fraudulently, as required New York law, *see Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 422-23 (S.D.N.Y. 2022) ("When analyzing unjust enrichment claims, New York courts generally consider 'whether the defendant's conduct was tortious or fraudulent.'"); *Hassan v. Fordham Univ.*, 533 F. Supp. 3d 164, 169 (S.D.N.Y. 2021) (allegations that the defendant had "chosen not to refund" certain fees and "did not provide any reason at all" why it made such decisions did not "rise to the level of tortious or fraudulent conduct sufficient to support an unjust enrichment claim"). As such, Plaintiff's unjust enrichment claim must also be dismissed.

### D.        Fraud and Fraudulent Nondisclosure

Finally, KFC moves to dismiss Plaintiff's claims for fraud and fraudulent nondisclosure. (Dkt. No. 17-1, at 16). KFC argues that these claims "lack required elements" under Kentucky law and "fall well short of the heightened pleading standard of Fed. R. Civ. P. 9(b)." (*Id.*). Plaintiff disagrees, arguing that New York law applies to its fraud claims, and that Plaintiff pleads its facts "with the requisite particularity as to substance, time, place, and to the extent practicable, person[.]" (Dkt. No. 21, at 26-28).

"In a federal diversity action such as this one, a state-law fraud claim must be pleaded with particularity pursuant to Rule 9(b)." *Steadman v. Citigroup Glob. Markets Holdings Inc.*, 592 F. Supp. 3d 230, 245-246 (S.D.N.Y. 2022). Particularity "requires that the plaintiff '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal citation omitted) (citing Fed. R. Civ. P. 9(b)). "Although '[m]alice, intent, knowledge and other condition of mind of a person may be

averred generally,'" *id.* (quoting Fed. R. Civ. P. 9(b)), "this leeway is not a 'license to base claims

of fraud on speculation and conclusory allegations[,]'" *id.* (quoting *Acito v. IMCERA Group, Inc.,*

47 F.3d 47, 52 (2d Cir.1995)). "'[P]laintiffs must allege facts that give rise to a strong inference

of fraudulent intent,' which may be established 'either (a) by alleging facts to show that

defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that

constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.*

(quoting *Acito*, 47 F.3d at 52).

      Here, Plaintiff has failed to plausibly plead fraudulent statements or omissions: Plaintiff

fails to allege either facts supporting an inference that KFC "had both motive and opportunity to

commit fraud," or facts that "constitute strong circumstantial evidence of conscious misbehavior

or recklessness" on the part of KFC. *See id.* Plaintiff alleges that "KFC, by its oral and written

words, conduct, or a combination of its words and conduct, [ ] created an untrue or misleading

impression in the mind of Franchisee regarding its intentions regarding the Guidelines and the

Guideline Agreement[.]" (Dkt. No. 14, ¶ 68). Specifically, Plaintiff alleges that KFC "intended

that the Guidelines be gratuitous, and that they not be binding on it or enforceable against it by

[Plaintiff], so that it could open the New Outlets in violation of the Guidelines if it saw fit." (*Id.* ¶

38). But Plaintiff does not detail any words or conduct supporting this allegation: Plaintiff did

not allege any action or omission on the part of KFC that violated the Franchise Agreement or

the Guideline Agreement. As Plaintiff itself alleges, KFC notified Plaintiff in writing that it was

considering opening the New Outlet—which opened in December of 2021—on June 30, 2020.

(*Id.* ¶ 23, 40). As such, Plaintiff received far more than the 30 days advance notice required by

the Franchise Agreement. (*See* Dkt. No. 14-1, at 21). In accordance with the Franchise

Agreement, KFC also gave Plaintiff a "Right of First Offer" to operate the New Outlet, which

Plaintiff declined. (Dkt. No. 14, ¶ 23-24). KFC then offered to perform an impact study if Plaintiff paid the $6,000 fee, performed the study, and found a potential impact of approximately 9.7%. (*See id.* ¶ 25-29). None of these actions indicate that KFC "intended that the Guidelines be gratuitous[.]" (*See id.* ¶ 38).

Plaintiff has also failed to allege specific false statements or omissions with particularity. Plaintiff refers to certain promises that were made by KFC or its representatives in several places at several times, (*see* Dkt. No. 14, ¶¶ 14, 17), but does not state what was *false* about these statements. The Complaint alleges that KFC falsely "held itself out and represented and promised to Franchisee that it would exercise its discretion reasonably and in good faith[,]" (*id.* ¶¶ 19-20) without specifying the speaker, nor where or when these promises were made. Further, Plaintiff argues that KFC lied when its representative informed Plaintiff that the Guidelines "offer[ed] existing franchisees protections 'over and above the territory protections in their franchise agreements[,]'" (*see* Dkt. No. 21, at 27 (citing Dkt. Nos. 14, ¶ 14; 14-3))—but the Guidelines (and the resulting Guideline Agreement) *did* offer Plaintiff protections beyond its Franchise Agreement, because the Franchise Agreement does not contemplate an impact study. Finally, Plaintiff contends that the impact study was done in bad faith, but fails to plead facts supporting such an inference. *See* discussion *supra* section IV.B.3. Therefore, Plaintiff has failed to plead its fraud and fraudulent nondisclosure claims with the particularity required by Rule 9(b).

## V.    LEAVE TO AMEND

Plaintiff seeks leave to file a second amended complaint. (*See* Dkt. No. 21, at 28 n.8). KFC has not opposed this request. Under Federal Rule of Civil Procedure 15(a), absent certain circumstances not at play here, a party may amend its pleading only with the opposing party's

written consent or the court's leave. See Fed. R. Civ. P. 15(a)(1)–(2). Rule 15(a)(2) requires that a court "freely give leave when justice so requires." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). But a court may, in its discretion, deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (quoting *Bensch v. Est. of Umar*, 2 F.4th 70, 81 (2d Cir. 2021). A request to amend is futile where the problem with the claim is "substantive" and "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Here, Plaintiff has not identified how it could amend the complaint. However, because it is conceivable that the First Amended Complaint's deficiencies could be fixed with better pleading, the Court grants Plaintiff's request for leave to file a second amended complaint.

## VI.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 17) is **GRANTED** in its entirety; and it is further

**ORDERED** that any amended complaint must be filed within thirty days of the date of this decision; and it is further

**ORDERED** that if Plaintiff fails to file a second amended complaint within thirty days of the date of this decision this case will be closed without further order.

**IT IS SO ORDERED.**

Dated: <u>March 10, 2025</u>
         Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge